**PSINET INC., et al., Plaintiffs,**

v.

**Warner D. CHAPMAN,
et al., Defendants.**

**No. 3:99CV00111.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 11, 2001.

Garrett M. Smith, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, VA, Norman Christopher Hardee, Wiley, Rein & Fielding, Washington, DC, John Joshua Wheeler, Charlottesville, VA, for plaintiffs.

Mark L. Earley, William Henry Hurd, Office of Atty. Gen., Richmond, VA, for Warner D. Chapman, James L. Camblos, III, defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

The plaintiffs move for summary judgement in this action for an injunction against enforcement of Va.Code Ann. Section 18.2–391 (Michie Supp.1999) (amended 2000), which criminalizes the dissemination by computer of material that is harmful to minors. This court has already issued a preliminary injunction against enforcement of section 18.2–391, and in so doing concluded that the plaintiffs had demonstrated that they were likely to succeed on the merits of their claim that section 18.2–391 violated the First Amendment and the Commerce Clause of the United States Constitution. The plaintiffs now ask this court to grant summary judgement and issue a final injunction against enforcement of section 18.2–391.

This action mirrors a number of other cases addressing both state and federal statutes that resemble section 18.2–391. Similar statutes in New York, New Mexico and Michigan prohibiting the use of the Internet to communicate material deemed "harmful to minors" have already been found unconstitutional. See *American Libraries v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir.1999); and *Cyberspace Communications v. Engler*, 55 F.Supp.2d 737 (E.D.Mich.1999). In *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (hereinafter, "*Reno I*"), the Supreme Court held that a federal statute, the Communications Decency Act ("CDA"), which prohibited Internet users from using the Internet to communicate material deemed patently offensive to minors, violated the First Amendment. Most recently, the Child Online Protection Act, Pub.L. No. 105–277, 112 Stat. 2681 (1998) (codified at 47 U.S.C. § 231) ("COPA"), which attempts to "address[ ] the specific concerns raised by the Su-

preme Court" in invalidating the CDA, was nevertheless found unconstitutional by the Third Circuit in *ACLU v. Reno*, 217 F.3d 162 (3d Cir.2000) (hereinafter *"Reno II "*).

Section 18.2–391, like those state and federal statutes resembling it, was passed in response to what appears to be a legitimate concern regarding the proliferation of pornography on the Internet and the relative ease with which such material can be accessed by minors. However, despite precedent supporting the validity of similar statutes regulating sexually explicit media in physical spaces, courts have been reluctant to uphold statutes like the one before this court based on fundamental differences between cyberspace and physical space. While this court agrees that the direct application to the Internet of statutes drafted with only the physical world in mind is inappropriate, we do not feel that a statute's implication of the Internet alone should render it invalid, or that differences between law as it applies in the physical world and law as it applies in cyberspace should be overstated. Technological advancements may, in the not-too-distant future, permit statutes similar to the one now before this court to regulate constitutionally content on the Internet. However, given the present state of Internet technology, it is patent that the bare application of the statute in question to the Internet would unconstitutionally interfere with the dissemination of protected speech to adults. That is, enforcement of section 18.2–391 will unduly burden the access of adults to protected speech that is nevertheless putatively harmful to minors. In addition, technology does not currently allow content providers to control efficiently access to their material according to geographic criteria, and thus enforcement of section 18.2–391 would impose a substantial burden on interstate commerce. Because section 18.2–391, as drafted, violates the First Amendment and the Commerce Clause, the court finds that summary judgement is appropriate in this case and grants the plaintiffs' motion.

### I.

#### C. The Plaintiffs

The plaintiffs represent a spectrum of businesses, membership organizations, and individuals—including Internet service providers, organizations representing booksellers, publishers, and other media interests, online businesses, individual authors and artists, and others—who use the Internet to communicate, disseminate, display, and seek access to a broad range of speech. The plaintiffs communicate online both within and from outside the Commonwealth of Virginia, and the plaintiffs' speech is accessible both within and outside of Virginia. All of the plaintiffs utilize the Internet to further their business and organizational goals. The plaintiffs fear that their online speech could be considered "harmful to juveniles" in some communities under the statute in question, Va.Code Ann. Section 18.2–391 (Michie Supp.1999) (amended 2000), even though that speech may receive full constitutional protection as to adults.

#### D. The Challenged Statute

For a number of years, the Commonwealth of Virginia has prohibited the knowing display in physical space of materials used for a commercial purpose that are harmful to juveniles. *See American Booksellers v. Commonwealth*, 882 F.2d 125, 126 (4th Cir.1989). Codified as Code of Virginia § 18.2–391 in 1970, this law was reenacted as amended in 1999, pursuant to 1999 Va.Acts ch. 936, to include not only material in physical space, but also electronic files or messages. The law was again reenacted in 2000, pursuant to the amendments adopted in 2000 Va.Acts ch. 1009. The plaintiffs' complaint challenges 1999 Va.Acts ch. 936 ("the Act"), codified

in § 18.2–391 ("the statute"), which adds phrases to expand the section's criminal prohibitions to cover "electronic file[s] or message[s]." The Virginia legislature passed the Act on April 7, 1999. The Act went into effect on July 1, 1999.

The statute, as amended, makes it unlawful to "sell, rent or loan to a juvenile" or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse:

> 1. Any picture, photography, drawing, sculpture, motion picture film, *electronic file or message containing an image*, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or
> 2. Any book, pamphlet, magazine, printed matter however reproduced, *electronic file or message containing words*, or sound recording which contains any matter enumerated in subdivision 1 of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.

Va.Code Ann. § 18.2–391 (Michie Supp. 1999) (amended 2000) (emphasis added). A violation of § 18.2–391 is a Class I misdemeanor, punishable by "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Va.Code Ann. § 18.2–11(a) (Michie 1950).

The 2000 Amendment to § 18.2–391 adds to the statute the following paragraph:

> [I]f a person uses services of an Internet service provider or an electronic mail service provider in committing acts prohibited under this subsection, such Internet service provider or electronic mail

service provider shall not be held responsible for violating this subsection. Va.Code Ann. § 18.2–391 (effective July 1, 2000). This amendment was voted upon and passed by the Virginia legislature after the parties had been heard on the plaintiffs' motion for a preliminary injunction. The court then required supplemental briefs to be filed addressing the new amendment and its effect, if any, on the plaintiffs' complaint. The 2000 amendment creates a defense for ISPs and email service providers when a person violating the statute uses the services of an ISP or email service provider in the commission of the offense. This defense does not affect the merits of the plaintiffs' claim because the statute maintains a prohibition on the use of electronic files or messages to allow juveniles to examine or peruse material that is harmful to juveniles. Thus, an ISP or email service provider may still be liable under the statute when they are responsible for creating the allegedly harmful content.

The definitional provisions relevant to § 18.2–391 are contained in § 18.2–390. The Virginia Code Annotated, § 18.2–390(6), defines the term "harmful to juveniles" as:

> that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it
>
> (a) predominantly appeals to the prurient, shameful or morbid interest of juveniles,
>
> (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and
>
> (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

Va.Code Ann. § 18.2–390(6) (Michie 1950). Section 18.2–390 does not define the relevant "community" for purposes of deter-

mining what is "harmful to juveniles" in the global medium of cyberspace. The statutory term "for commercial purpose" is likewise undefined. *See* Va.Code Ann. § 18.2–11(a) (Michie 1950). However, Virginia Code § 18.2–390(7) defines "knowingly" to mean:

> having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both (a) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (b) the age of the juvenile, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such juvenile.

Va.Code.Ann. § 18.2–390(7) (Michie 1950).

## II.

A motion for summary judgement should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 279 (4th Cir. 2000) (quoting *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). If the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party, then there are genuine issues of material fact. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986). All facts and reasonable inferences that can be drawn therefrom must be interpreted in the light most favorable to the non-moving party. *See Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990). However, the non-movant may not rest upon mere allegations and denials of the pleadings, and must assert more than a "mere scintilla" of evidence in support of her case in order to survive an adverse entry of summary judgement. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III.

The Internet is a decentralized, global medium of communications that links people, institutions, corporations, and governments around the world. It is a giant computer "network of networks" which interconnects innumerable smaller groups of linked computer networks and individual computers offering a range of digital information including text, images, sound and video. While estimates are difficult due to its constant and rapid growth, host computers—those storing the information and relaying communications on the Internet—number in the tens of millions, and personal computers accessing the Internet have been estimated in the hundreds of millions. The court does not recite here the specifics of how the Internet functions; where necessary any relevant features of the Internet are described in the analysis of this case. This court described the general contours of the Internet in its memorandum opinion addressing the plaintiffs' motion for a preliminary injunction, and various other judicial opinions provide thorough descriptions of the Internet as well. *See Reno I,* 521 U.S. at 849–57, 117 S.Ct. 2329 (1997); *Cyberspace, Communications, Inc. v. Engler,* 55 F.Supp.2d 737, 740–44 (E.D.Mich.1999); *American Libraries Assoc. v. Pataki,* 969 F.Supp. 160, 164–67 (S.D.N.Y.1997); *Shea v. Reno,* 930 F.Supp. 916, 925–34 (S.D.N.Y.1996).

## IV.

The plaintiffs claim that the Act violates the First Amendment. The plaintiffs ar-

gue, and this court agrees, that, given the current state of Internet technology, enforcement of the Act will restrict the access of both adults and children to material considered "harmful to minors." That is, in its efforts to restrict the access of minors to indecent material on the Internet, the Act imposes, albeit unintentionally, an unconstitutional burden on protected adult speech. While the Act's unconstitutional nature is clear, a formal First Amendment analysis is nevertheless prudent given the likelihood of future legislative efforts to address the exposure of children to indecent material on the Internet and the rapid pace at which Internet technology advances.

 Because section 18.2–391 is a content-based restriction on expression protected by the First Amendment [1], it is presumptively invalid and can only be upheld if it survives strict scrutiny. *See United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (citing *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). The Supreme Court has emphasized that strict scrutiny applies to content-based regulation of Internet speech. *See Reno I*, 521 U.S. at 870, 117 S.Ct. 2329. To satisfy strict scrutiny, the law in question must be (1) narrowly tailored to (2) promote a compelling government interest. *See Playboy*, 529 U.S. at 813, 120 S.Ct. 1878.

 The government has the burden of showing that a content-based regulation of speech "is necessary to serve a compelling state interest." *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 786, 788–89, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). This burden is not insignificant. Merely asserting that the government has an interest in preventing some harm cannot justify the suppression of free speech if insufficient evidence exists to suggest that such harm is likely to occur in the absence of regulation. That is, "that the Government's asserted interests are important in the abstract does not mean, however, that the [regulation] will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms; it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (quoting *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (D.C.Cir.1985)). *See also* Catherine J. Ross, *Anything Goes: Examining the State's Interest in Protecting Children from Controversial Speech*, 53 Vand. L.Rev. 427 (2000) (discussing the necessity of rigorous "compelling interest" analysis).

 In this case, the state's asserted interest in protecting, and helping parents to protect, minors from sexually explicit materials is compelling. The Supreme Court has recognized this interest in numerous cases. In *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Court upheld a New York statute prohibiting the sale to minors of material harmful to them, even if the distribution of those materials to adults is protected. The Court identified two interests the state has in limiting the availability of sex materials to minors. First, the Court stated that "the legislature could properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg*, 390 U.S. at 639, 88 S.Ct.

---

**1.** While obscenity is not protected by the First Amendment, the Act also extends to indecent speech, which is protected by the First Amendment.

1274. The Court noted that, while this support would assist parents who wish to limit their children's access to sex material, it would not bar a nonconformist parent from purchasing sex magazines for their children. *Id.* Second, the Court asserted that "the state also has an independent interest in the well-being of its youth." *Id.*

The two interests acknowledged by the Court in *Ginsberg* were echoed in its decision in *FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In *Pacifica,* the Court upheld the constitutionality of an FCC finding that the broadcast of George Carlin's "Filthy Words" monologue was indecent and prohibited by statute. *Id.* In so holding, the Court determined that the broadcast of patently offensive words dealing with sex, although not obscene, may be regulated because of its content. These indecent words offend for the same reasons that obscenity offends, and are of slight social value. Furthermore, the Court found that the broadcast was uniquely accessible to children, implicating the government's interest in the "well-being of its youth" as expressed in *Ginsberg. Pacifica,* 438 U.S. at 749, 98 S.Ct. 3026 (quoting *Ginsberg,* 390 U.S. at 640, 88 S.Ct. 1274).

Society's interest in shielding children from exposure to indecent material has been reaffirmed in a trilogy of recent cases addressing state statutes similar to the one at issue in this action. *ACLU v. Johnson,* 194 F.3d 1149 (10th Cir.1999), *Cyberspace Communications v. Engler,* 55 F.Supp.2d 737 (E.D.Mich.1999), and *American Libraries v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997), all considered the constitutionality of state statutes prohibiting the use of computers or the Internet to disseminate indecent materials to minors. In each case, the courts found an indisputably compelling interest in protecting the physical and psychological well-being of minors.

Furthermore, in *Reno I,* in which the Supreme Court held that portions of the Communications Decency Act ("CDA"), 47 U.S.C. § 223(a)(1), (d), violated the First Amendment, the Court recognized that the government has a compelling interest in protecting children from material that is harmful to them, even if not obscene by adult standards. *Reno I,* 521 U.S. at 870, 117 S.Ct. 2329.

This court agrees that the state has a compelling interest in restricting minors' access to offensive material. The dearth of empirical evidence establishing a link between the exposure of minors to sexually explicit material and antisocial behavior does not alter this conclusion. By recognizing the compelling interest now asserted by the defendants, courts have implicitly acknowledged what Congress and many state governments have indicated by their decisions to pass legislation like that now before this court. Namely, the majority of those primarily responsible for the well-being of children feel exposure to non-educational, sexually explicit material can have a negative effect on a child's development. The state government has a compelling interest in helping those parents and teachers who wish to avoid the exposure of their children to this material. While some parents may feel concerns regarding indecent material are exaggerated, these parents can still access sexually explicit material on the Internet for their children even if safeguards like those contemplated by the defendants are in place. While this court recognizes that the Internet is a very different medium than the brick and mortar bookstore, the burden imposed on a parent seeking to procure indecent material for her child on the Internet is arguably less substantial than that imposed on a parent desiring to purchase a sexually explicit magazine for her child at a bookstore. A parent accessing

indecent material on the Internet does not need even to leave her home.

Furthermore, concerns regarding government support for consensus child development standards are overstated. This court recognizes that parental views regarding what activities and materials are suitable for children are not always in harmony. Some parents believe minors should have relatively unrestricted access to firearms, while others do not. Many parents feel the current age restrictions on the consumption of alcoholic beverages are too restrictive and that controlled exposure to alcohol at a younger age may lead to more moderate and mature consumption practices in the future. Nevertheless, governments have imposed regulations in these areas and many others not only out of concern for the danger these activities pose to third parties, but also as state measures reinforcing widely held social values.

Perhaps most closely analogous to the exercise of government authority embodied in section 18.2–391 is the state mandated minimum age for marriage in Va.Code Ann. Section 20–48 (Michie Supp.2000). Like the exposure of minors to indecent sex material, the marriage of children under sixteen years of age is unlikely to have an immediate and tangible negative impact on third parties. Nevertheless, states have implemented age restrictions on marriage, not only suggesting that individuals should have some minimum level of maturity to enter into marriage, but also reinforcing normative expectations regarding family stability. These expectations have also been voiced at the national level. For example, in passing the 1996 welfare reform legislation, Congress determined that "(1) Marriage is the foundation of a successful society; (2) Marriage is an essential institution of a successful society which promotes the interests of children; and (3) Promotion of responsible fatherhood and motherhood is integral to successful child rearing and the well-being of children." Personal Responsibility Act, 42 U.S.C. § 601.

In *American Booksellers,* 882 F.2d 125 (4th Cir.1989), the Fourth Circuit upheld the constitutionality of the underlying statute in question and in doing so found that the state had a compelling interest in regulating the distribution of speech in print format when that speech is considered harmful to minors. In this case, the state's interest in restricting harmful speech on the Internet is just as compelling as that upheld in *American Booksellers.* In fact, "many of the same characteristics which make cyberspace ideal for First Amendment expression—ease of participation and diversity of content and speakers" make it a potentially more harmful media for children than the print media. *ACLU v. Reno,* 31 F.Supp.2d 473, 476 (E.D.Pa.1999).

However, even if the government has a compelling interest in restricting speech, that restriction must be narrowly tailored in order to survive strict scrutiny. A law is narrowly tailored if it employs the least restrictive means to achieve its goal and if there is a nexus between the government's compelling interest and the restriction. *See City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). If a less restrictive means of meeting the compelling interest could be at least as effective in achieving the legitimate purpose that the statute was enacted to serve, then the law in question does not satisfy strict scrutiny. *See Reno I,* 521 U.S. at 874, 117 S.Ct. 2329. Furthermore, the burden imposed by the government on speech must be outweighed by the benefits gained by the challenged statute. *See Elrod v. Burns,* 427 U.S. 347, 363, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

■ As this court indicated in its August 8, 2000 Memorandum Opinion granting the plaintiffs' motion for a preliminary injunction, the 1999 Act is not narrowly tailored. In *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court held that indecent speech, which is constitutionally protected for adults, may not be abridged in an effort to protect children unless the regulation is narrowly tailored to restrict only that speech expected to reach children. In contrast to the pre-amendment version held acceptable in *American Booksellers*, implementation of the 1999 Act will restrict the access of both adults and children. The critical fact that distinguishes the 1999 Act from its pre-amendment version is the former's inclusion of material on the Internet. The pre-amendment version of section 18.2–391 applied only to traditional media in physical spaces, and thus made it possible to restrict minors' access to indecent material without substantially burdening adult access. For example, in a brick and mortar bookstore, a magazine considered harmful to minors can be wrapped in protective covering and placed behind the counter where only adults can purchase it. Presently, the same cannot be said for material on the Internet. That is, efforts to comply with the 1999 Act will result in the exclusion of too many adults from accessing material to be constitutionally sound.

The defendants argue that minimally burdensome measures are available to commercial Internet pornographers who want reasonable assurances that juveniles will not peruse materials on their site. Furthermore, the defendants claim that execution of these measures will not unduly restrict adults' access to indecent material on the Internet. For example, the defendants contend that credit card identification systems can be used to verify that an individual accessing a Web site is an adult, presumably based on the shaky premise that credit cards are only issued to those who are at least eighteen years of age. Furthermore, a number of Web sites condition access on the presentation of an adult identification number (PIN) issued to the user by any one of a number of independent third-party firms specializing in adult identification. Upon completion of an online application requiring name, address and a valid credit card number, adult identification firms issue one or two-year PINs to users for a fee of about seventeen dollars. Greg Miller, *Law to Control Online Porn Creates Strange Bedfellows*, L.A. Times, February 15, 1999, at A1. There are approximately twenty-five adult verification services on the web, and as of February 1999, the largest of these firms had issued approximately three million PINs which were accepted by approximately 46,000 Web sites. Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 809 (2001). A Web site operator can sign up for free with most adult identification firms and the site can earn commissions of up to 50% to 60% of the fees generated by users who sign up with a particular adult verification service. *Id.*

Nevertheless, the plaintiffs argue that the use of PINs and similar adult verification systems poses a substantial burden on both adult Web sites and their adult visitors. For example, the verification measures cited by the defendants require viewers to transmit credit card and other personal information in order to receive a PIN and/or gain access to Web site content. The plaintiffs argue that this imposes a burden on the communication of adults who (1) have no credit card, (2) are unwilling to disclose financial and personal information over the Internet and (3) do not want to create a record of their interest in accessing "adult sites." The burden on potential Web site visitors may, in turn, reduce traffic to Web sites utilizing adult verification systems. *Reno II*, 217 F.3d at

171. This loss of traffic may inflict economic harm on a web site. *Id.* In addition, while the software needed to operate a PIN verification system is available at no charge to Web site operators, the process of organizing prohibited content behind a Web site's adult screen imposes costs on Web site operators and content providers. Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause,* 110 Yale L.J. 785, 809 (2001).

 While compliance with the 1999 Act may impose a financial burden on Web site operators,

> First Amendment jurisprudence indicates that the relevant inquiry is determining the burden imposed on the *protected speech* regulated by [the statute], not the pressure placed on the *pocketbooks or bottom lines* of . . . Web site operators and content providers. . . . Strict scrutiny is required, not because of the risk of driving certain commercial Web sites out of business, but the risk of driving this particular type of speech from the marketplace of ideas. *ACLU v. Reno,* 31 F.Supp.2d 473, 495 (E.D.Pa. 1999).

The costs associated with implementing credit card screening devices and adult PIN systems are unlikely to drive adult Web sites from the "marketplace of ideas." The fact that thousands of adult Web sites currently utilize adult verification systems suggests that the burden associated with maintaining such a system is outweighed by continued consumer demand for the content these Web sites provide. Further-

more, because the 1999 Act is limited to material displayed for a commercial purpose, some of the concerns expressed by the Supreme Court in *Reno I* with regard to the CDA are inapplicable in this case. *See Reno I,* 521 U.S. at 865, 117 S.Ct. 2329. For example, commercial Web sites are less likely than noncommercial sites to be so burdened by the implementation of an adult identification system that they are forced to withdraw their content from the Internet.[2]

However, while this court does not find that the defendants' proposed compliance measures are overly burdensome on commercial Web sites, unlike the COPA and many other state statutes, the 1999 Act does not include an affirmative defense to prosecution for commercial Web sites if they in fact incorporate such compliance measures. Thus, even the most responsible adult Web sites may have legitimate concerns that they will be subjected to criminal liability in the state of Virginia. While the defendants urge this court to read a "good faith" affirmative defense into the 1999 Act, we are unwilling, and lack the authority, to add that which the legislature omitted.[3] Furthermore, even if, on a case by case basis, Web site operators could escape liability upon a showing at trial of efforts to exclude minors, this would do little to remove the chill associated with the uncertainty of facing criminal liability. The sword of Damocles causes harm because it hangs, not necessarily because it drops. See *Rafeedie v. INS,* 880 F.2d 506, 530 n. 8 (D.C.Cir.1989) (Gins-

**2.** However, this court notes that the term "commercial purpose" may be subject to varying interpretation, and is undefined in the Act. This term may include not only the traditional commercial Web sites on which this opinion focuses, but also content providers that allow users free access and profit through the use of advertising and other means. The use of adult verification systems may have a more significant financial impact

on these free, but nevertheless commercial, content providers.

**3.** The government's request that a "good faith" affirmative defense be read into the 1999 Act reminds this court of an aphorism that was often used by the Virginia General Assembly when confronted with similar appeals: "Put not your faith in the good intentions of men. Write the law tight."

burg, J., concurring) (quoting LAWRENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 1023 (2d. ed.1988)).

In addition, although the compliance measures recommended by the defendants are unlikely to have a substantial effect on commercial Web site operators, they may impose a significant burden on those seeking to access adult Web sites. The stigma often associated with these Web sites may deter some individuals from accessing the sites if admission is conditioned on the receipt of personal information. That is, many adults do not want to create a record of their visits to sexually explicit Web sites. Furthermore, many question whether it is possible to convey credit card information on the Internet in a secure manner. Fear that cyber-criminals may access their credit card numbers causes many individuals to abstain from making even the most uncontroversial purchases on the Internet. Thus, even if the proposed adult verification measures are unlikely to have a chilling effect on the speech of content providers, implementation of those measures may chill the willingness of some adults to participate in the "marketplace of ideas" which adult Web site operators provide. While the deterrent effect verification measures may have on some adults is by itself insufficient to subdue the state's compelling interest in assisting parents with the protection of their children, the Act's aggregate effect on adults, Web site operators and other content providers is substantial.

Finally, despite the parties' focus on commercial adult Web sites, the Act applies broadly to the Internet and the many different communication formats it encompasses, including newsgroups, bulletin boards and chat rooms.[4] While the 2000 Amendment to section 18.2–391 makes some attempt to exclude Internet service providers (ISPs) and electronic mail service providers from liability for the actions of their users, this amendment does not provide service providers with unconditional immunity. An ISP or email service provider may still be liable under the statute when they are responsible for creating the harmful content, and one can even envision a circumstance in which a service provider could be held responsible for the actions of a third-party when it is suggested that the service provider "knowingly" condoned the availability of "harmful content." The defendants have failed to suggest that some equivalent to the adult verification measures currently available to commercial Web site operators exists with regard to ISPs and electronic email providers. Similarly, a bulletin board or newsgroup may confront liability under the 1999 Act. Bulletin board and newsgroup operators have less control over the content their forums present than traditional commercial Web sites, which limit user contribution. In contrast to Web sites devoted to adult material, the use of the adult verification measures recommended by the defendants on bulletin boards and newsgroups comes at the extremely high cost of preventing minors from accessing the abundance of material in those forums that has substantial social value.[5] That is, while the majority of mes-

---

4. Note that the 1999 Act's broad application to the entire Internet is similar to that of the CDA, which the Supreme Court deemed unconstitutional. In an attempt to address this problem, Congress passed the COPA, which restricted its scope to material on the Web rather than the Internet as a whole. COPA defines the clause "by means of the World Wide Web" as the "placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol or any successor protocol." 47 U.S.C. § 231(a)(1).

5. In *Reno II*, the district court suggested that the COPA would be narrower if its scope were limited to graphics and pictures, which constitute the predominant format of adult Web

sages posted on a particular bulletin board or similar communication format may not be harmful to minors, users may be forced to put in their credit cards before accessing *any* of the board's content due to the potential that some inappropriate material may be posted.

This court recognizes the need for some regulation of online content, and finds myopic the arguments of those who advocate an anarchical cyberspace. However, because, in the aggregate, the 1999 Act imposes a substantial burden on protected speech, its enforcement must be enjoined. Primarily, the often indefinite language of the 1999 Act, in conjunction with its lack of available affirmative defenses, makes compliance with its provisions exceedingly onerous. Additionally, the defendants fail to address the significant burden the 1999 Act imposes on bulletin boards, newsgroups and commercial Web sites that consist predominantly of material suitable for minors. The proposed compliance measures may also chill the willingness of adults to access adult Web sites.

Furthermore, the 1999 Act's impotence weighs against it. This court acknowledges that no law is perfect in its application, and that some minors will always manage to access that which is forbidden to them. However, as the plaintiffs correctly assert, the global nature of the Internet assures that even the most stringent laws in the United States are unlikely meaningfully to limit access to adult material available on Web sites based in other countries. Currently, technology is incapable of preventing content originating abroad from being accessed by Web users in the United States. Thus, even if the 1999 Act were to be upheld, minors in Virginia would have access to a substantial amount of indecent material on servers outside of the country. That is, "unlike

statutes that are ... differentially enforced in different areas, yet are still justified because they limit harm to some extent in the local areas in which they are actively enforced ... [the 1999 Act] applies to the Internet, which by its nature has no local areas." Charles Nesson & David Marglin, *The Day the Internet Met the First Amendment: Time and the Communications Decency Act,* 10 Harv. J.L. & Tech. 113, 131 (1996). The inability of the 1999 Act to support effectively the compelling interests at issue makes it difficult to justify the burden the Act imposes on protected speech.

## A. Commerce Clause Challenge

The plaintiffs also contend that the Act must be struck down because it contravenes the Commerce Clause. *See* U.S. Const. Art I., § 8, cl. 3. Although this court need not address the Commerce Clause arguments, as the First Amendment claim is sufficient to carry the day, the Commerce Clause will be discussed in brief.

■■■ The negative implication of the Commerce Clause, U.S. Const. Art I., § 8, cl. 3, includes a prohibition on state regulation that "discriminates against or unduly burdens interstate commerce" and thereby "imped[es] free private trade in the national marketplace." *General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (citing and quoting *Reeves, Inc. v. Stake,* 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)); *see also South Central Bell Telephone Co. v. Alabama,* 526 U.S. 160, 170–71, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999) (declining invitation to abandon negative commerce clause jurisprudence). State statutes similar to Virginia Code § 18.2–391 have been found to burden interstate

sites. While such an alteration to the 1999 Act would not, by itself, keep the Act from being

deemed unconstitutional, it would make the Act more acceptable.

commerce unduly by placing restrictions on electronic commercial materials in all states, not just the state in which the statute was enacted. The leading case applying the dormant Commerce Clause in this manner is *American Libraries Ass'n v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997). In *American Libraries Ass'n*, the court determined that, because there was currently no way to limit access to online materials by geographic location, a Web site owner operating legally in California could be deemed to have sent prohibited content to, and thus be subjected to liability in, New York. Faced with the potential for prosecution in New York, the California Web site may be deterred from making adult material available on the Internet. In effect, the New York statute would have discouraged legitimate commerce wholly outside New York's borders and thus imposed an undue burden on Interstate commerce.

■ The plaintiffs in this case echo the *American Libraries Ass'n* court's concern regarding a state statute's extraterritorial effect on commerce. However, it should be noted that many legitimate state regulations impose out-of-state costs. Most relevant to this case are state obscenity regulations on providers of real-space pornography. These providers must comply with the varying regulations of those states and localities to which they distribute. State obscenity regulations are not invalidated under the Commerce Clause because they impose compliance costs on businesses located outside their state's borders.[6]

■ Nevertheless, state laws regulating cyberspace pornography currently impose a much greater burden on out-of-state businesses providing adult material on the Internet than state laws regulating

real-space pornography impose on out-of-state adult magazine publishers and other real-space pornography providers. While some advancement has been made since *American Libraries Ass'n* was decided, it remains technologically infeasible for a Web site operator to limit access to online materials by geographic location. Thus, to avoid prosecution, an adult Web site operator must comply with the most restrictive state obscenity regulations if it is to make its content available on the Web at all. In contrast, purveyors of real-space pornography can choose to comply with the regulations of only those states to which they affirmatively distribute. This leads the court to conclude that, due to the current status of geographic filtering technology on the Internet, section 18.2–391 violates the Commerce Clause.

### III.

In accordance with the foregoing, the plaintiffs' motion for summary judgement shall be granted. An appropriate order this day shall enter.

### ORDER

On May 17, 2001, the plaintiff moved for summary judgement in the above-styled case. A hearing was held on the motion on July 27, 2001. For the reasons stated in the accompanying memorandum opinion, it is this day

### ADJUDGED ORDERED AND DECREED

that:

1. The plaintiff's Motion for Summary Judgement, filed May 17, 2001, shall be, and it hereby is, GRANTED.

---

6. For a helpful discussion regarding the application of the dormant Commerce Clause on the Internet, *see* Jack L. Goldsmith & Alan O.

Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 809 (2001)

2. The defendants shall be, and hereby are, permanently enjoined and prohibited from enforcing Va.Stat. § 18.2–391 to the extent it prohibits the sale, rental, loan or display of an "electronic file or message containing an image" or an "electronic file or message containing words."

The Clerk of Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record.