317 F.3d 413
 PSINET, INCORPORATED; Charlottesville Sexual Health & Wellness Clinic; Portico Publications, Ltd., Publisher of Charlottesville Weekly; Silverchair Science Communications, Incorporated; Commercial Internet Exchange Association; Virginia ISP Alliance; Rockbridge Global Village; American Booksellers Foundation for Free Expression; The Periodical and Book Association of America, Incorporated; Freedom to Read Foundation; Sexual Health Network; Chris Filkins, Proprietor of the Safer Sex Institute; Harlan Ellison; The Comic Book Legal Defense Fund; Susie Bright; A Different Light Bookstores; Lambda Rising Bookstores; Bibliobytes; People for the American Way, Plaintiffs-Appellees, and
United States Internet Service Provider Association, Plaintiff,
v.
Warren D. CHAPMAN, Commonwealth Attorney; James L. Cambloss, III, Commonwealth Attorney, Defendants-Appellants.
 No. 01-2352.
 United States Court of Appeals, Fourth Circuit.
 Argued October 28, 2002.
 Filed January 28, 2003.
 
 ARGUED: William Henry Hurd, State Solicitor, Office of the Attorney General, Richmond, Virginia, for Appellants. Thomas W. Kirby, Wiley, Rein & Fielding, L.L.P., Washington, D.C., for Appellees. ON BRIEF: Jerry W. Kilgore, Attorney General of Virginia, Alison P. Landry, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellants. Garrett M. Smith, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, Virginia; Michael A. Bamberger, Sonnenschein, Nath & Rosenthal, New York, New York; Elliot M. Mincberg, Lawrence S. Ottinger, People for the American Way Foundation, Washington, D.C.; Robert M. O'Neil, J. Joshua Wheeler, The Thomas Jefferson Center for the Protection of Free Expression, Charlottesville, Virginia, for Appellees.
 Before NIEMEYER, Circuit Judge, SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation, and DAVIS, United States District Judge for the District of Maryland, sitting by designation.
 Certification Order, entered by Judge NIEMEYER with the concurrences of Judge SPENCER and Judge DAVIS.
 ORDER OF CERTIFICATION TO THE SUPREME COURT OF VIRGINIA
 NIEMEYER, Circuit Judge.
 
 
 1
 The United States Court of Appeals for the Fourth Circuit, exercising the privilege afforded it by the Supreme Court of Virginia through its Rule 5:42 to certify questions of law to the Supreme Court of Virginia when a question of Virginia law is determinative in a pending action and there is no controlling Virginia precedent on point, requests the Supreme Court of Virginia to exercise its discretion to answer two questions of law contained in this Order of Certification.
 
 I. The Nature of the Controversy
 
 2
 A group of individual Internet users, Internet service providers ("ISPs"), website operators, and related trade associations commenced this action challenging the constitutionality of the 1999 amendment to Virginia Code § 18.2-391, 1999 Va. Acts ch. 936 ("the 1999 Amendment"), which regulates pornographic materials deemed "harmful to juveniles." The 1999 Amendment added to the materials regulated by the statute any "electronic file or message containing an image" or "containing words." As amended, the statute provides:
 
 
 3
 A. It shall be unlawful for any person to sell, rent or loan to a juvenile, knowing or having reason to know that such person is a juvenile, or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse:
 
 
 4
 1. Any picture, photography, drawing, sculpture, motion picture in any format or medium, electronic file or message containing an image, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or
 
 
 5
 2. Any book, pamphlet, magazine, printed matter however reproduced, electronic file or message containing words or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.
 
 
 6
 Va.Code § 18.2-391A (emphasis added to identify statutory language inserted by Amendment).
 
 A. Prior Litigation
 
 7
 When first enacted in 1970, Va.Code § 18.2-391 applied only to the sale, rental, or loan of pornographic material deemed "harmful to juveniles." Virginia modeled this law on a New York statute upheld against a First Amendment challenge by the Supreme Court in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
 
 
 8
 In 1985, Virginia amended its statute to prohibit not only the sale, rental, or loaning of material deemed "harmful to juveniles," but also the knowing display of such materials. In amended form, the statute provided: "It shall be unlawful for any person knowingly to sell, rent or loan to a juvenile, or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse," visual or written material that "depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles." Va.Code § 18.2-391(a) (emphasis added to identify statutory language inserted in 1985). This 1985 version of the statute became the subject of a First Amendment challenge that lasted over four years and produced five published opinions, including opinions by the United States Supreme Court and the Supreme Court of Virginia.
 
 
 9
 When we first reviewed the 1985 version of the statute, we held that "the [1985] amendment discourages the exercise of First Amendment rights in a real and substantial fashion, in that it is not readily susceptible to a narrowing interpretation so as to withstand an overbreadth challenge." American Booksellers Ass'n, Inc. v. Virginia, 802 F.2d 691, 696 (4th Cir. 1986). Although Virginia stressed that "only a small percentage of the inventory in book stores could be classified as harmful to juveniles" and therefore that "retail outlets can readily modify their display methods to comply with the amendment," we rejected Virginia's characterizations. Id. We ruled that "[t]he display methods suggested by the Commonwealth appear either insufficient to comply with the amendment or unduly burdensome on the first amendment rights of adults...." Id. We reasoned that "[p]lacing `adults only' tags on books and magazines or displaying the restricted material behind blinder racks or on adults only shelves freely accessible in the main part of the store would not stop any determined juvenile from examining and perusing the materials." Id. Further, "[f]orcing a bookseller to create a separate, monitored adults only section, requiring that the materials be sealed, or taking the materials off display and keeping them `under the counter' unreasonably interferes with the booksellers' right to sell the restricted materials and the adults' ability to buy them." Id.
 
 
 10
 The United States Supreme Court granted a writ of certiorari and, after hearing oral argument, certified two questions regarding interpretation of the 1985 statute to the Supreme Court of Virginia, pursuant to Rule 5:42 of the Virginia Supreme Court. 484 U.S. 383, 398, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). According to the United States Supreme Court, "an authoritative construction of the Virginia statute by the Virginia Supreme Court would substantially aid our review of [the] constitutional holding, and might well determine the case entirely." Id. at 386, 108 S.Ct. 636. Focusing on the scope of the law's coverage, the United States Supreme Court asked, in its first certified question:
 
 
 11
 Does the phrase "harmful to juveniles" as used in Virginia Code §§ 18.2-390 and 18.2-391 (1982 and Supp.1987), properly construed, encompass any of the books introduced as plaintiffs' exhibits below, and what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity?
 
 
 12
 Id. at 398, 108 S.Ct. 636. Virginia argued that none of the 16 books, which were submitted by the plaintiffs as books that the plaintiffs contended were covered by the statute, were in fact covered by the statute. It maintained that the reach of the statute was much narrower. Id. at 393-94, 108 S.Ct. 636. The United States Supreme Court noted that "[i]f that is true, methods of compliance exist that are substantially less burdensome than those discussed by the lower courts." Id. at 394, 108 S.Ct. 636. The Court concluded that "it is essential that we have the benefit of the law's authoritative construction from the Virginia Supreme Court." Id. at 395, 108 S.Ct. 636.
 
 
 13
 In the second question, the United States Supreme Court focused on what compliance measures potential defendants could take to avoid running afoul of the law's prohibition. Accordingly, the Supreme Court asked:
 
 
 14
 What meaning is to be given to the provision of Virginia Code § 18.2-391(a) (Supp.1987) making it unlawful "to knowingly display for commercial purpose in a manner whereby juveniles may examine or peruse" certain materials? Specifically, is the provision complied with by a plaintiff bookseller who has a policy of not permitting juveniles to examine and peruse materials covered by the statute and who prohibits such conduct when observed, but otherwise takes no action regarding the display of restricted materials? If not, would the statute be complied with if the store's policy were announced or otherwise manifested to the public?
 
 
 15
 Id. at 398, 108 S.Ct. 636. Whereas the plaintiffs alleged that compliance with the law would require drastic measures such as reconfiguring the store or completely barring minors from the store, Virginia argued that "a bookseller will not be subject to criminal prosecution if, as a matter of store policy, the bookseller prevents a juvenile observed reviewing covered works from continuing to do so, even if the restricted materials are not segregated." Id. at 396, 108 S.Ct. 636. The United States Supreme Court explained the importance of the second question: "If this is what the statute means, the burden to the bookseller, and the adult bookbuying public, is significantly less than that feared and asserted by plaintiffs." Id. at 397, 108 S.Ct. 636.
 
 
 16
 The Supreme Court of Virginia accepted the certified questions and responded to the first question, applying the three-part test set forth in the statute, Va.Code § 18.2-390(6), defining the term "harmful to juveniles." Virginia v. American Booksellers Ass'n, Inc., 236 Va. 168, 372 S.E.2d 618 (1988). As to the first two prongs of the test, the court recognized that they presented questions of fact for determination by a properly instructed jury. Id. at 176, 372 S.E.2d at 623. The third prong, however, was found to involve a mixed question of law and fact that the court could properly decide. Id. at 176, 372 S.E.2d at 623. The court concluded that "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." Id. at 177, 372 S.E.2d at 624. The court then concluded that none of the books submitted by the plaintiffs as exhibits lacked serious literary, artistic, political, or scientific value for a legitimate minority of older, normal adolescents, and thus none of the books were "harmful to juveniles" within the meaning of Va.Code § 18.2-390(6). Id. at 177, 372 S.E.2d at 624.
 
 
 17
 The Supreme Court of Virginia also provided a narrow construction in responding to the certified question focusing on compliance measures. The court explained that the scienter requirement in the statute was significant: "A violation must consist of proof beyond a reasonable doubt that the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles." American Booksellers, 236 Va. at 179, 372 S.E.2d at 625 (emphasis added). Again, the court stated, "[r]easonable efforts to prevent perusal of harmful materials by juveniles are all that the statute requires of a bookseller." Id. at 179, 372 S.E.2d at 625. According to the Virginia Supreme Court, "[t]he question whether a bookseller's efforts were reasonable, in any given set of circumstances is, of course, an issue of fact to be resolved by a properly-instructed jury, but certain general principles may be discerned." Id. at 179, 372 S.E.2d at 625. The court then provided "a clear example of a method a bookseller might easily adopt" to avoid violating the statute. Id. If a bookseller placed all restricted books on a shelf in the sight of the bookseller and intervened whenever a juvenile attempted to peruse and examine books on that shelf, then the bookseller would be in compliance with the statute. Id. at 179-80, 372 S.E.2d at 625. Finally, with the assumption that "the hypothetical bookseller `who has a policy of not permitting juveniles to examine and peruse materials covered by the statute' does not merely cerebrate upon such a policy, but takes reasonable steps to put it into effect," the court answered the second certified question in the affirmative. Id. at 180, 372 S.E.2d at 625. According to the Virginia Supreme Court, the amended statute "imposes a relatively light burden upon the bookseller, in contrast to the state's interest in protecting juveniles from materials harmful to them." Id.
 
 
 18
 Upon receipt of the Supreme Court of Virginia's answers to the two certified questions, the United States Supreme Court vacated our initial decision and remanded for our consideration in light of the Supreme Court of Virginia's answers. Virginia v. American Booksellers Ass'n, Inc., 488 U.S. 905, 109 S.Ct. 254, 102 L.Ed.2d 243 (1988). In view of the Virginia Supreme Court's construction of the statute, we reversed our previous conclusion that the 1985 statute was unconstitutionally overbroad under the First Amendment. 882 F.2d 125, 126 (4th Cir.1989). We noted the Supreme Court of Virginia's explanation that "the 1985 amendment was not aimed at mere browsing but at `the opportunity [a bookseller] may afford to juveniles to take off the shelves books which they are unable to buy, and to read them in the store.'" Id. at 127. Most importantly, we stated that we "agree with the Virginia Supreme Court that the amendment to the statute places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state's police powers." Id. at 127-28.
 
 B. Present Litigation
 
 19
 After the 1999 Amendment was enacted, the plaintiffs commenced this action in December 1999 facially challenging the 1999 Amendment as unconstitutional under the First Amendment and the dormant Commerce Clause. They alleged that the 1999 Amendment extended the reach of the statute from physical space into cyberspace and, because of the nature of the Internet, the 1999 Amendment was not sufficiently precise to withstand strict scrutiny under the First Amendment. They also alleged a dormant Commerce Clause violation.
 
 
 20
 By order dated October 11, 2001, the district court granted summary judgment to the plaintiffs, permanently enjoining the enforcement of Virginia Code § 18.2-391 "to the extent it prohibits the sale, rental, loan or display of an `electronic file or message containing an image' or an `electronic file or message containing words.'" In doing so, the court ruled that the extension of the law to the Internet created a violation of the First Amendment where there previously was none. According to the district court:
 
 
 21
 The pre-amendment version of section 18.2-391 applied only to traditional media in physical spaces, and thus made it possible to restrict minors' access to indecent material without substantially burdening adult access. For example, in a brick and mortar bookstore, a magazine considered harmful to minors can be wrapped in protective covering and placed behind the counter where only adults can purchase it. Presently, the same cannot be said for material on the Internet. That is, efforts to comply with the 1999 Act will result in the exclusion of too many adults from accessing material to be constitutionally sound.
 
 
 22
 PSINET, Inc. v. Chapman, 167 F.Supp.2d 878, 887 (W.D.Va.2001). The Commonwealth of Virginia defended the statute before the district court by arguing that cyberspace and physical space were not fundamentally different with regard to distinguishing between adults and juveniles. According to Virginia, "minimally burdensome measures are available to commercial Internet pornographers who want reasonable assurances that juveniles will not peruse materials on their site." Id. at 887. Just as a physical store can create an adults-only section for videos or an adults-only shelf for books, the Commonwealth argued, so an Internet site can create adults-only pages that may only be accessed after the user has input a credit card number or an adult-check PIN. The district court, however, rejected this argument because of the district court's determination that "the 1999 Act does not include an affirmative defense to prosecution for commercial Web sites if they in fact incorporate such compliance measures." Id. at 888. The court explained that because the Act lacked an affirmative defense, "even the most responsible adult Web sites may have legitimate concerns that they will be subjected to criminal liability in the state of Virginia." Id.
 
 
 23
 Additionally, the district court concluded that even if the 1999 Amendment contained an affirmative defense for those implementing technological access controls, the statute would still violate the First Amendment because "despite the parties' focus on commercial adult Web sites, the Act applies broadly to the Internet and the many different communication formats it encompasses, including newsgroups, bulletin boards and chat rooms." 167 F.Supp.2d at 889.
 
 
 24
 The district court also held that the 1999 Amendment violated the dormant Commerce Clause.
 
 
 25
 We are now faced with a situation not unlike that presented to this court in the litigation challenging the constitutionality of the 1985 version of the statute. Mindful of the course that the prior litigation followed, we conclude that it is appropriate to certify two questions to the Supreme Court of Virginia relating to the scope of the 1999 Amendment.
 
 II. The Questions of Law to be Answered
 
 26
 A. Would the use of any of the technological access controls identified by the Attorney General of Virginia preclude conviction under Virginia Code § 18.2-391 as amended in 1999?
 
 
 27
 B. Does the prohibition against knowingly displaying pornographic materials that are "harmful to juveniles" apply to displays made only in connection with the sale, rental, or loan of such materials? If not, what must the government establish to prove that a defendant has knowingly displayed such materials "for commercial purpose"?
 
 III. Statement of Facts
 
 28
 Because this is a facial challenge to Virginia Code § 18.2-391 and because the 1999 Amendment has been enjoined since shortly after it became effective, there are no facts relevant to how the amended law has been enforced. The plaintiffs, however, have advanced their personal situations as to how they would be affected by enforcement of the statute.
 
 
 29
 The plaintiffs are businesses that provide Internet access (e.g., PSI-Net, the Commercial Internet Exchange Association); businesses that provide content transmitted over the Internet (e.g., Charlottesville Sexual Health & Wellness Clinic, A Different Light Bookstores); individuals who provide content transmitted over the Internet (e.g., Susie Bright); and membership organizations representing individuals whose access to pornographic materials would be limited by the law (e.g., People for the American Way).
 
 
 30
 The underlying facts relate primarily to the nature of the Internet, and most of the district court's factual findings, or more precisely observations, relating to this are contained in its August 2000 opinion granting a preliminary injunction. See PSINet, Inc. v. Chapman, 108 F.Supp.2d 611, 614-16 (W.D.Va.2000). Although the district court modified the preliminary injunction when it granted the permanent injunction and entered summary judgment in favor of the plaintiffs, its opinion supporting its judgment explicitly incorporated the observations about the nature of the Internet from its earlier opinion. See PSINET, Inc., 167 F.Supp.2d at 883.
 
 
 31
 The district court's description of the nature of the Internet was heavily derivative of findings made by other courts that had previously described the nature of the Internet. See PSINet, Inc., 108 F.Supp.2d at 614-16. Although these findings are actually observations and some may need to be modified or updated to reflect changes in technology while others may not be relevant, particularly if the statute is given a narrower construction than that adopted by the district court, we quote the district court's findings at length because they might provide a useful overview of the context within which the present challenge has proceeded:
 
 
 32
 The Internet is a decentralized, global medium of communications that links people, institutions, corporations, and governments around the world. Host computers — those storing information and relaying communications on the Internet — number in the tens of millions, and personal computers accessing the Internet have been estimated to number in the hundreds of millions. The information available on the Internet is of very diverse subject matter. At any given moment, the Internet also serves as a communication medium for literally tens of thousands of conversations, debates, and social dialogues. Content ranges from academic writings, to art and literature, to medical information, to music, to news and other information, some of which contains sexually explicit material.
 
 
 33
 The Internet is distinguishable from traditional media because the Internet simply links together enormous numbers of individual computers and computer networks; therefore, no single entity or group controls the content that is available on the Internet, or the access to that content. There is no centralized point from which individual Web sites or services can be blocked. Rather, the almost infinite range of information available on the Internet is supplied by millions of users on millions of separate computers around the world.
 
 
 34
 * * * * * *
 
 
 35
 There are a variety of ways for communicating and exchanging information with other users on the Internet. The primary methods include: (1) email, which enables an individual to send an electronic message generally akin to a note or letter to an individual address or to a group of addresses; (2) instant messaging, which allows an online user to address and transmit an electronic message to one or more people with little delay between the sending of an instant message and its receipt by the addressees; (3) online discussion groups, such as "chat rooms," thousands of which have been organized by individuals, institutions, and organizations; and (4) the World Wide Web, which is currently the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can post content on the Web, which can then be accessed by any other user anywhere in the world. The Web comprises millions of separate interconnected "Web sites" that may in turn have hundreds of separate "pages" displaying content provided by the particular person or organization that created the site.
 
 
 36
 * * * * * *
 
 
 37
 For most communications over the Internet, the speaker has little or no effective control over whether minors or adults are able to gain access to his communications. In addition, speakers who publish on the Web generally make their materials publicly available to users around the world, regardless of age, and lack any practical or reliable means for preventing minors from gaining access to the information on their sites or for verifying the true age of users of their Web sites. The Internet also is wholly insensitive to geographic distinctions, and Internet protocols were designed to ignore rather than to document geographic location. While computers on the Internet do have "addresses," they are addresses on the network rather than geographic addresses in real space. Most Internet addresses contain no geographic information at all. An Internet user who posts a Web page in one state cannot readily prevent residents of other states from viewing that page, or even discern in which state visitors to the site reside. Participants in online chat rooms and discussion groups have no way to tell when participants from another state join the conversation. There is no practical way for an Internet speaker to prevent a message from reaching residents of his own or any particular state.
 
 
 38
 The overwhelming majority of information on the Web is provided to users free. However, much online speech is displayed for commercial purposes where enterprises are seeking to use the Web to advance their business and organizational goals. Companies do so in a variety of ways. Some businesses, like ISPs, charge their customers for providing an electronic "pipeline" through which the customers may view information on the Internet, or for storing data that customers wish to place on the Web. In addition, to attract and retain subscribers, ISPs may also provide other Internet services such as email or chat rooms, access to which is included in subscribers' fees. Other Web companies generate revenue through advertising. These businesses offer content to attract readers, and sell access to those Web users to advertisers interested in reaching that audience.
 
 
 39
 Many online content providers — including booksellers, music stores, and art providers — allow potential customers to browse their wares free on the Internet, similar to browsing an actual book store or art gallery. Web shoppers may view samples, summaries, or even entire works at no charge, before deciding whether to make a purchase. Even apart from the material on the Web, a great deal of communication that takes place via the Internet serves a commercial purpose. For example, many entities offer free email or chat rooms to draw users to their sites, so that the sites will be more attractive to potential customers, advertisers or paying contributors. Businesses use email to communicate more efficiently with customers, suppliers, and within their own organizations.
 
 
 40
 Id. at 614-16 (footnote and internal citations omitted).
 
 IV. The Parties and Their Counsel
 A. The plaintiffs-appellees are:
 
 41
 PSINet, Inc.; Charlottesville Sexual Health & Wellness Clinic; Portico Publications, Ltd., Publisher of C-Ville Weekly; Silverchair Science & Communications, Inc.; Virginia ISP Alliance; Rockbridge Global Village; American Booksellers Foundation for Free Expression; The Periodical and Book Association of America, Inc.; Freedom to Read Foundation; Sexual Health Network; Chris Filkins, Proprietor of the Safer Sex Institute; Harlan Ellison; The Comic Book Legal Defense Fund; Susie Bright; A Different Light Bookstores; Lambda Rising Bookstores; Bibliobytes; and People for the American Way.
 
 Counsel for the plaintiffs-appellees are:
 
 42
 Norman Christopher Hardee Thomas W. Kirby Wiley, Rein, & Fielding LLP 1776 K Street, N.W. Washington, D.C. 20006 202-719-7000
 
 
 43
 Michael A. Bamberger Sonnenschein, Nath & Rosenthal 1221 Avenue of the Americas, 24th Floor New York, New York 10020 212-768-6700
 
 
 44
 Elliot M. Mincberg Lawrence S. Ottinger People for the American Way Foundation 2000 M Street, N.W., Suite 400 Washington, D.C. 20036 202-467-4999
 
 
 45
 Robert M. O'Neil J. Joshua Wheeler The Thomas Jefferson Center for the Protection of Free Expression 400 Peter Jefferson Place Charlottesville, Virginia 22911 434-295-4784
 
 
 46
 Garrett M. Smith Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C. 500 Court Square, Suite 300 Charlottesville, Virginia 22902 434-982-8919
 
 B. The defendants-appellants are:
 
 47
 Warren D. Chapman, Commonwealth Attorney, and James L. Cambloss, III, Commonwealth Attorney.
 
 Counsel for the defendants-appellants are:
 
 48
 Jerry W. Kilgore, Attorney General of Virginia
 
 William H. Hurd, State Solicitor
 
 49
 Alison P. Landry, Assistant Attorney General Office of the Attorney General 900 East Main Street Richmond, Virginia 23219 804-786-2436
 
 
 50
 V. Certified Questions as Determinative of This Proceeding
 
 
 51
 Just as the scope of the 1985 version of Virginia Code § 18.2-391 was determinative in 1989 of whether the statute was constitutional, the scope of the 1999 Amendment is determinative of whether the statute is constitutional at this time. Ascertaining the scope of the law's coverage and what compliance measures would preclude conviction is necessary for resolution not only of the First Amendment claim, but also for resolution of the dormant Commerce Clause claim, should it be necessary for us to reach the latter issue.
 
 
 52
 According to the Supreme Court of Virginia, "[a] violation [of Virginia Code § 18.2-391 (1985 version)] must consist of proof beyond a reasonable doubt that the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles." American Booksellers, 236 Va. at 179, 372 S.E.2d at 625 (emphasis added). The question that is now posed by the 1999 Amendment to Virginia Code § 18.2-391, which extends regulation to the Internet, is whether the implementation of a technological screen to sort juveniles from adults constitutes a "reasonable step" that would preclude prosecution. Earlier, the Supreme Court of Virginia explained that "[t]he question whether a bookseller's efforts were reasonable, in any given set of circumstances is... an issue of fact," but "certain general principles may be discerned." Id. at 179, 372 S.E.2d at 625 (emphasis added). The court instructed that a bookseller who placed restricted books on a shelf within sight of the bookseller had taken a reasonable step to comply with the law, and this form of compliance provided "a clear example of a method a bookseller might easily adopt" to avoid violating the statute. Id. The same sort of interpretative guidance provided by the Supreme Court of Virginia with regard to compliance measures in physical space is now needed with regard to compliance measures in cyberspace.
 
 
 53
 Thus, we have presented the first question of whether any technological access controls identified by Virginia would preclude conviction under the 1999 version of Virginia Code § 18.2-391.
 
 
 54
 Similarly, the second question certified addresses the scope of the statute's coverage in cyberspace. Prior to the 1999 Amendment, the scope of the law's application was fairly clear — it applied to booksellers, video rental stores, and newsstands in Virginia. With the 1999 Amendment, however, we are uncertain about the scope of the Act as applied to the Internet. In the world of physical bookstores and other merchants located within Virginia's borders, there was no need to construe the statutory phrase "for commercial purpose" in the portion of the statute stating that "[i]t shall be unlawful ... to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse" any material deemed "harmful to juveniles." Va.Code § 18.2-391A (emphasis added). By and large, the physical locations in which pornographic materials were sold, rented, and loaned were the same locations where such materials were knowingly displayed for commercial purpose. The entire focus of the prior litigation was on the law's application to booksellers and other merchants.
 
 
 55
 Virginia contends that the 1999 Amendment makes the law applicable primarily to Web-based "commercial pornographers." Although Virginia does not describe what is meant by "commercial pornographer," it apparently intends to denote by this term — consistent with the reach of the statute prior to the 1999 Amendment — a person or business who sells, rents, or loans pornography and otherwise knowingly displays such pornography in connection with the sale, rental, or loan of pornography. Under this interpretation, the 1999 Amendment merely extends the reach of the law to the electronic equivalent of bookstores, newsstands, and video rental stores. In addition to the cyberspace equivalent of bookstores and newsstands, however, the Internet includes news groups, e-mail, and informational websites, all of which may arguably be operated "for commercial purpose" using a different business model than a traditional bookstore.
 
 
 56
 The plaintiffs, challenging the 1999 Amendment as too broad, point out that
 
 
 57
 [m]ost Internet communications and information remain free of charge, even when displayed or disseminated for commercial purposes. In one common model, many web businesses provide content (e.g. news, sports, weather, traffic information, music, hobby information, and so on) that they hope will attract visitors, and they then sell advertising.... Booksellers and music stores often allow anonymous online visitors to browse excerpts or summaries without charge, and they also may sponsor bulletin boards, chat rooms, provide alerts to matters of special interest to patrons, and so on.
 
 
 58
 The plaintiffs also emphasize that "Internet speech that has a commercial purpose is by no means limited to website displays. Rather, it includes all other Internet modalities."
 
 
 59
 In response to these assertions, Virginia argues that "[t]here is no evidence that those who send or post messages by these non-web modalities typically do so with a commercial purpose." It states further that even "assuming that some speakers use non-web-based Internet modalities to display harmful messages for a commercial purpose — and assuming that there is no way to separate the adult and juvenile audiences (an allegation in dispute) — it is by no means evident that those speakers are entitled to engage in harmful speech before such a mixed audience."
 
 
 60
 One consequence of the plaintiffs' interpretation is that it results in a reading of the statute that reaches significantly more broadly than Virginia interprets the statute to reach. Yet, the United States Supreme Court has held "that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, and its deterrent effect on legitimate expression is both real and substantial." Erznoznik v. City of Jacksonville, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (internal citations omitted). Cf. Ashcroft v. ACLU, 535 U.S. 564, 122 S.Ct. 1700, 1721, 152 L.Ed.2d 771 (2002) (Kennedy, J., concurring) (noting that the Federal Child Online Protection Act "seems to apply even to speech provided for free, so long as the speaker merely hopes to profit as an indirect result," and indicating that the Court of Appeals never addressed whether the statute's "commercial purposes" language significantly narrowed the reach of the statute's prohibitions); id. ("It is crucial... to know how limiting is the Act's limitation to `communication for commercial purposes'").
 
 
 61
 Thus, the validity of the Act as extended to cyberspace may depend on how narrowly it is construed by the Supreme Court of Virginia. Accordingly, we have posed the second question, which relates to whether "for commercial purpose" is intended to mean displays made in connection with the "sale, rental, or loan of such materials."
 
 
 62
 In certifying both questions, we are mindful of the Supreme Court's admonition that "[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." Arizonans for Official English v. Arizona, 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Such concerns exist to an even greater extent in the unusual circumstances of this case, where we are asked to invalidate a state law that previously had been held constitutional after the Supreme Court of Virginia construed an earlier version of the same law, with the only difference between the versions provided by the extension of the law's reach to the Internet.
 
 
 63
 For these reasons, we conclude that "an authoritative construction of the Virginia statute by the Virginia Supreme Court would substantially aid our review of [the] constitutional holding, and might well determine the case entirely." American Booksellers, 484 U.S. at 386, 108 S.Ct. 636.
 
 VI. Relevant Decisions
 
 64
 Based on the narrowing construction of Virginia Code § 18.2-391 given by the Supreme Court of Virginia to the pre-1999 version of the statute in American Booksellers, 236 Va. at 168, 372 S.E.2d at 618, we held the statute in its pre-1999 form constitutional against a First Amendment challenge in American Booksellers, 882 F.2d at 125. The 1999 Amendment added "electronic files" and "messages" to the materials regulated, and there is no decision of the Supreme Court of Virginia or the Court of Appeals of Virginia that has construed the statute, as amended in 1999.
 
 VII. Order
 
 65
 Pursuant to the privilege made available by Rule 5:42 of the Supreme Court of Virginia relating to the certification of questions of law, it is hereby ordered:
 
 
 66
 A. That the questions stated in Part II above be, and the same hereby are, certified to the Supreme Court of Virginia for answers;
 
 
 67
 B. That the Clerk of this court forward to the Supreme Court of Virginia, under the official seal of this court, a copy of this Certification Order, together with the original or copies of the record before this court to the extent requested by the Supreme Court of Virginia; and
 
 
 68
 C. That any request for all or part of the record be fulfilled by the Clerk of this court simply upon notification from the Clerk of the Supreme Court of Virginia.
 
 
 69
 This order is entered by Judge Niemeyer, with the concurrences of Judge Spencer and Judge Davis.