*242 NIEMEYER, Circuit Judge,
dissenting:
Acting under its police powers, the Commonwealth of Virginia enacted Virginia Code § 18.2-391 making it unlawful “to knowingly display for commercial purpose” pornographic materials that are harmful to juveniles “in a manner whereby juveniles may examine and peruse” them. Va.Code Ann. § 18.2-391(a) (1985). Materials were designated to include any visual representation or image, any printed matter however reproduced, and any sound recording. Id.
In 1988, the Supreme Court of Virginia construed the scope of this statute narrowly, see Commonwealth v. Am. Booksellers Ass’n, Inc., 236 Va. 168, 372 S.E.2d 618 (1988), and based on this narrow construction, we held the statute to be constitutional against a First Amendment challenge, see Am. Booksellers Ass’n, Inc. v. Virginia, 882 F.2d 125, 127-28 (4th Cir.1989) (concluding that the statute “places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state’s police powers”), cert. denied, Am. Booksellers Ass’n, Inc. v. Virginia, 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).
Virginia amended § 18.2-391 in 1999 to make it explicit that the specified examples of visual, written, and recording media that were regulated included any “electronic file or message.” Va.Code Ann. § 18.2-391(A) (1999).
This action was commenced to mount a renewed facial First Amendment challenge to this statute, as amended in 1999. On plaintiffs’ motion for summary judgment, the district court held that the statute violated the First Amendment, as well as the dormant Commerce Clause, of the U.S. Constitution, and permanently enjoined enforcement of the statute in the electronic medium. On appeal, the majority now affirms.
For the reasons that follow, I disagree and therefore respectfully dissent. First, we rejected a facial First Amendment challenge to this statute in American Booksellers, 882 F.2d 125, and that ruling now binds us in this case, compelling us to uphold the constitutionality of the statute against this second facial challenge. Second, even if we conduct the First Amendment analysis again, I would find the statute constitutional because (1) Virginia has a compelling interest in protecting its juveniles from harmful pornographic materials, (2) the Virginia statute employs the least restrictive alternative that will promote Virginia’s interest, especially in view of the Virginia Supreme Court’s authoritative construction of the statute, and (3) by application of minimally burdensome technology that is now available, no speech among adults is suppressed. I would also conclude that the statute does not violate the dormant Commerce Clause. Accordingly, I would reverse the judgment of the district court and vacate the injunction that the district court entered against enforcement of Virginia Code § 18.2-391.
I
When first enacted in 1970, Virginia Code § 18.2-391 applied only to the sale, rental, or loan of pornographic material deemed “harmful to juveniles.” Virginia modeled its statute on a New York statute upheld against a First Amendment challenge by the Supreme Court in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
In 1985, Virginia amended § 18.2-391 to prohibit not only the sale, rental, or loaning of material deemed “harmful to juveniles,” but also to the knowing display of such materials for commercial purpose. In amended form, the statute provided:
*243 (a) It shall be unlawful for any person knowingly to sell, rent or loan to a juvenile, or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse:
1. Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or
2. Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.
Va.Code Ann. § 18.2-391(a) (emphasis added to identify statutory language inserted by amendment) (“1985 Version”).
The 1985 Version of the statute became the subject of a First Amendment challenge that produced five opinions by the U.S. Supreme Court, the Supreme Court of Virginia, and our court, but in the end it was held not to violate the First Amendment.
When we first reviewed the 1985 Version of the statute, conducting a review of a facial challenge, we held that the 1985 Version “diseourage[d] the exercise of first amendment rights in a real and substantial fashion, in that it [was] not readily subject to a narrowing interpretation so as to withstand an overbreadth challenge.” Am. Booksellers Ass’n, Inc. v. Virginia, 802 F.2d 691, 696 (4th Cir.1986) (“American Booksellers I”). Although Virginia stressed that “only a small percentage of the inventory in book stores could be classified as harmful to juveniles” and therefore that “retail outlets [could] readily modify their display methods to comply with the amendment,” we rejected Virginia’s characterizations. Id. We ruled that “[t]he display methods suggested by the Commonwealth appeared] either insufficient to comply with the amendment or unduly burdensome on the first amendment rights of adults.... ” Id. We reasoned that “[p]laeing ‘adults only’ tags on books and magazines or displaying the restricted material behind blinder racks or on adults only shelves freely accessible in the main part of the store would not stop any determined juvenile from examining and perusing the materials.” Id. Further, “[f]orcing a bookseller to create a separate, monitored adults only section, requiring that the materials be sealed, or taking the materials off display and keeping them ‘under the counter’ unreasonably interfered] with the booksellers’ right to sell the restricted materials and the adults’ ability to buy them.” Id.
On review, the U.S. Supreme Court concluded that the Virginia Supreme Court’s construction of the statute might better determine the statute’s constitutionality: “[A]n authoritative construction of the Virginia statute by the Virginia Supreme Court would substantially aid our review of [the] constitutional holding, and might well determine the case entirely.” Virginia v. Am. Booksellers Ass’n, Inc., 484 U.S. 383, 386, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The Court accordingly certified two questions regarding interpretation of the 1985 Version to the Supreme Court of Virginia, pursuant to Rule 5:42 of the Virginia Supreme Court. Id. at 398, 108 S.Ct. 636. Focusing on the scope of the law’s coverage, the United States Supreme Court asked in its first question:
Does the phrase “harmful to juveniles” as used in Virginia Code §§ 18.2-390 and 18.2-391 (1982 and Supp.1987), properly construed, encompass any of *244 the books introduced as plaintiffs’ exhibits below, and what general standard should be used to determine the statute’s reach in light of juveniles’ differing ages and levels of maturity?
Id. at 398, 108 S.Ct. 636. Virginia argued that none of the 16 books that were submitted by the plaintiffs as books covered by the statute were in fact covered by the statute. It maintained that the reach of the statute was much narrower. Id. at 393-94, 108 S.Ct. 636. The U.S. Supreme Court noted that “[i]f that is true, methods of compliance exist that are substantially less burdensome than those discussed by the lower courts.” Id. at 394, 108 S.Ct. 636. The Court concluded that “it is essential that we have the benefit of the law’s authoritative construction from the Virginia Supreme Court.” Id. at 395, 108 S.Ct. 636.
In the second question, the U.S. Supreme Court focused on what compliance measures potential defendants could take to avoid running afoul of the law’s prohibition. Accordingly, the Supreme Court posed as its second question:
What meaning is to be given to the provision of Virginia Code § 18.2-391(a) (Supp.1987) making it unlawful “to knowingly display for commercial purpose in a manner whereby juveniles may examine or peruse” certain materials? Specifically, is the provision complied with by a plaintiff bookseller who has a policy of not permitting juveniles to examine and peruse materials covered by the statute and who prohibits such conduct when observed, but otherwise takes no action regarding the display of restricted materials? If not, would the statute be complied with if the store’s policy were announced or otherwise manifested to the public?
484 U.S. at 398, 108 S.Ct. 636. Whereas the plaintiffs alleged that compliance with the law would require drastic measures such as reconfiguring the store or completely barring minors from the store, Virginia argued that “a bookseller will not be subject to criminal prosecution if, as a matter of store policy, the bookseller prevents a juvenile observed reviewing covered works from continuing to do so, even if the restricted materials are not segregated.” Id. at 396, 108 S.Ct. 636. The U.S. Supreme Court explained the importance of the second question: “If this is what the statute means, the burden to the bookseller, and the adult book buying public, is significantly less than that feared and asserted by plaintiffs.” Id. at 397,108 S.Ct. 636.
The Supreme Court of Virginia accepted the certified questions and responded to the first question, applying the three-part test set forth in the statute, Va.Code Ann. § 18.2-390(6), defining the term “harmful to juveniles.” * Commonwealth v. Am. Booksellers Ass’n, Inc., 236 Va. 168, 372 S.E.2d 618 (1988). As to the first two prongs of the test, the court recognized that they presented questions of fact for determination by a properly instructed jury. Id. at 623. The third prong, however, was found to involve a mixed question of law and fact that the court could properly decide. Id. The court concluded that “if a work is found to have a serious literary, *245 artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.” Id. at 624. The Virginia court then concluded that none of the books submitted by the plaintiffs as exhibits lacked serious literary, artistic, political, or scientific value for a legitimate minority of older, normal adolescents, and thus none of the books were “harmful to juveniles” within the meaning of Va.Code Ann. § 18.2-390(6). Id.
The Supreme Court of Virginia also provided a narrow construction of the 1985 Version in responding to the certified question focusing on compliance measures. The court explained that the scienter requirement in the statute was significant:
A violation must consist of proof beyond a reasonable doubt that [1] the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, [2] being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles.
372 S.E.2d at 625. Again, the court stated, “[rjeasonable efforts to prevent perusal of harmful materials by juveniles are all that the statute requires of a bookseller.” Id. According to the Virginia court, “[t]he question whether a bookseller’s efforts were reasonable, in any given set of circumstances is, of course, an issue of fact to be resolved by a properly-instructed jury, but certain general principles may be discerned.” Id. The court then provided “a clear example of a method a bookseller might easily adopt” to avoid violating the statute. Id. If a bookseller placed all restricted books on a shelf in the sight of the bookseller and intervened whenever a juvenile attempted to peruse and examine books on that shelf, then the bookseller would be in compliance with the statute. Id. Finally, with the assumption that “the hypothetical bookseller ‘who has a policy of not permitting juveniles to examine and peruse materials covered by the statute’ does not merely cerebrate upon such a policy, but takes reasonable steps to put it into effect,” the court answered the second certified question in the affirmative. Id. According to the Virginia Supreme Court, the 1985 Version “imposes a relatively light burden upon the bookseller, in contrast to the state’s interest in protecting juveniles from materials harmful to them.” Id.
Upon receipt of the Supreme Court of Virginia’s answers to the two certified questions, the U.S. Supreme Court vacated our decision in American Booksellers I and remanded the case to us for reconsideration of the case in light of the Virginia Supreme Court’s answers construing the statute narrowly. Virginia v. Am. Booksellers Ass’n, Inc., 488 U.S. 905, 109 S.Ct. 254, 102 L.Ed.2d 243 (1988).
In view of the Virginia Supreme Court’s construction of the statute, we reversed our previous conclusion that the 1985 Version was unconstitutional under the First Amendment. Am. Booksellers Ass’n, Inc. v. Virginia, 882 F.2d 125, 126 (4th Cir.1989) (“American Booksellers II”). We noted that the Supreme Court of Virginia’s explanation that “the 1985 amendment was not aimed at mere browsing but at ‘the opportunity [a bookseller] may afford to juveniles to take off the shelves books which they are unable to buy, and to read them in the store.’” Id. at 127. Most importantly, we stated that we “agree with the Virginia Supreme Court that the amendment to the statute places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state’s police powers.” Id. at 127-28. The 1985 Version was thus ultimately held con *246 stitutional against a facial First Amendment challenge. The Supreme Court denied the petition for a writ of certiorari. Am. Booksellers Ass’n, Inc. v. Virginia, 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).
To clarify the all-inclusiveness of § 18.2-391 — which applied to any visual representation or image, any printed matter however reproduced, and any sound recording— and to make explicit that visual, written, or sound-recorded materials include those created or transmitted electronically, Virginia amended the statute in 1999 to specify that a visual representation or image includes an “electronic file or message containing an image” and that printed matter however reproduced includes an “electronic file or message containing words.” 1999 Va. Acts ch. 936 (codified as Va.Code Ann. § 18.2-391(A)) (the “1999 Amendment”).
The plaintiffs commenced this action as a second facial challenge of § 18.2-391 in view of the clarifying 1999 Amendment. Contending that the statute is unconstitutional under the First Amendment and under the dormant Commerce Clause of the U.S. Constitution, they allege that the 1999 Amendment extended the reach of the 1985 Version of the statute from physical space into cyberspace and that, because of the nature of the Internet, the 1999 Amendment is not sufficiently precise to withstand strict scrutiny under the First Amendment. They also allege that Virginia’s regulation imposes an undue burden on interstate commerce because the effect of the statute is to restrict commercial electronic materials in all states, not just Virginia, for which the statute was enacted. Because the plaintiffs filed this action before enforcement of § 18.2-391 as amended in 1999, there are no facts to govern its application in this case. The plaintiffs could and did allege only how they believed they would be affected by enforcement of the statute. The plaintiffs are businesses that provide Internet access (e.g., PSINet, the Commercial Internet Exchange Association); businesses that provide content transmitted over the Internet (e.g., Charlottesville Sexual Health & Wellness Clinic, A Different Light Bookstores); individuals who provide content transmitted over the Internet (e.g., Susie Bright); and membership organizations representing individuals whose access to pornographic materials would be limited by the law (e.g., People for the American Way).
The district court granted the plaintiffs’ motion for summary judgment and permanently enjoined Virginia from enforcing Virginia Code § 18.2-391 “to the extent it prohibits the sale, rental, loan or display of an ‘electronic file or message containing an image’ or an ‘electronic file or message containing words.’ ” PSINET, Inc. v. Chapman, 167 F.Supp.2d 878, 892 (W.D.Va.2001). In doing so, the court ruled that the extension of the law to the Internet created a violation of the First Amendment where there previously had been none. As the district court explained:
The pre-amendment version of section 18.2-391 applied only to traditional media in physical spaces, and thus made it possible to restrict minors’ access to indecent material without substantially burdening adult access.... [T]he same cannot be said for material on the Internet. That is, efforts to comply with the 1999 [Amendment] will result in the exclusion of too many adults from accessing material to be constitutionally sound.
Id. at 887. The district court also held that the 1999 Amendment violated the dormant Commerce Clause. As the court explained:
[S]tate laws regulating cyberspace pornography currently impose a much *247 greater burden on out-of-state businesses providing adult material on the Internet than state laws regulating real-space pornography imposed on out-of-state adult magazine publishers and other real-space pornography providers .... Thus, to avoid prosecution, an adult Web site operator must comply with the most restrictive state obscenity regulations if it is to make its content available on the Web at all.... This leads the court to conclude that, due to the current status of geographic filtering technology on the Internet, § 18.2-391 violates the Commerce Clause.
Id. at 891.
From the district court’s permanent injunction entered against Virginia on October 11, 2001, prohibiting enforcement of the 1999 Amendment, Virginia appealed.
II
The Commonwealth of Virginia contends first that American Booksellers II, 882 F.2d 125, which rejected a facial challenge to the statute on vagueness and First Amendment grounds, precludes this second facial challenge to the extent that this challenge is also based on the First Amendment. It acknowledges that American Booksellers II does not preclude consideration of the dormant Commerce Clause issue, nor would it preclude a later “as applied” claim filed by persons who were not party to the American Booksellers case. But Virginia notes correctly that this case is not an “as applied” claim, but a second facial challenge.
The district court rejected Virginia’s position, citing three reasons. First, the court observed that “common sense tells a reader of the statute that the initial catchall phrases of the statute do not cover Internet materials.” PSINet, Inc. v. Chapman, 108 F.Supp.2d 611, 620 (W.D.Va.2000). The court pointed out that “printed matter however reproduced” in the statute “refers to printed matter — not electronic material.” Id. Second, the district court noted that when the 1985 Version was enacted, “Internet communication was not envisioned.” Id. And third, it asserted that by making the change, the Virginia legislature must be “presumed to act with purpose” and therefore it “add[ed] something entirely different to the statute.” Id. at 620-21.
As amended in 1985, § 18.2-391 makes unlawful a commercial transaction through which pornographic material harmful to juveniles is sold, rented, loaned, or displayed. The media that are included in the 1985 statute are: “Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image” and “[a]ny book, pamphlet, magazine, printed matter however reproduced, or sound recording.” Va.Code Ann. § 18.2-391(a) (1985). In reading this statute in a common sense manner, the district court seemed to have been focused on “printed matter” and did not recognize the breadth of the statute, which not only includes very specific media as examples but which also indicates an intent to cover all media that may be seen, read, or heard. Stripped of the examples provided, the statute prohibits the transference of pornographic material harmful to juveniles through any “visual representation or image,” any “printed matter however reproduced,” and any “sound recording.” The obvious focus of the Virginia legislature was on all media that reach the eyes or ears of juveniles. Thus, when the Virginia legislature added as another example of those media, the electronic medium “containing an image” or “containing words,” it was not adding substance to the previous intended language of any “visual representation or image,” any “printed matter however reproduced,” and any *248 “sound recording.” Surely, the original statutory language would include harmful material displayed on video tape played on a television or created by electronic means, such as a digital camera. I respectfully submit that common sense— rather than suggesting an interpretation restricted to any medium that does not include the electronic medium — suggests that the Virginia legislature always intended to include all media, and when it added the electronic medium to the list of examples included, it was simply clarifying the statute for the increasingly pervasive electronic age. There is no indication that the 1985 Version was intended to exclude any medium then in place or thereafter possible. Rather, the defining criteria were visual material, words, and sound.
The district court’s observation that the Internet could not have been envisioned by the legislature in 1985 and therefore it was necessary to add the reference to electronic medium is unfounded for two reasons. First, it is apparent historically that in 1985, the distribution of pornography by tape recordings and computers was already a problem and that at least one state legislature had already addressed it and others were addressing it. See Computer Pornography and Child Exploitation Act of 1985, S. 1305, 99th Cong. (1985); Computer Pornography and Child Exploitation Act: Hearings on S. 1305 Before the Sub-comm. on Juvenile Justice of the Senate Comm, on the Judiciary, 99th Cong. 17 (1985) (testimony of Kenneth V. Lanning, FBI Special Agent, describing the use of computer bulletin boards by pedophiles to communicate with one another); 1982 Cal. Stat. c. 936, at 3395 (amending section 313 of the California Penal Code by adding “computer program” to the list of media capable of disseminating harmful matter to children); D’Vera Cohn, Kiddy Porn Enters Computer Age, United Press International, Dec. 8, 1982 (describing the increasing use of computers and video recorders by child pornographers); Police Uncover Child Pornography Ring, Associated Press, Feb. 6, 1980 (reporting arrest of suspect “accused of plotting a national and possibly worldwide computerized child pornography scheme”).
Second, a statute that uses clearly inclusive language is not rendered inoperable for unanticipated circumstances that fall within the scope of the language. For example, the Fourteenth Amendment prescribes that no state may make any law denying “any person” “equal protection of the laws.” Yet no one anticipated at the time of its ratification in 1868 that all of the privileges accorded to men must also be accorded to women. Nonetheless, the unambiguous language of the protection included women, and it is so construed today. This follows the basic canon of statutory interpretation that we give the words in text their natural meaning, and so long as that meaning is not ambiguous, we presume that to be the intent of the legislature, even though such intent might be historically questioned.
Finally, the district court reasoned that by making an amendment in 1999, the Virginia legislature must have had a purpose. That purpose, however, need not have been to make a substantive change expanding the scope of the statute. An equally valid purpose would have been to provide clarification to a statute that would be increasingly applied to the electronic medium. Indeed, because of the preexisting all-inclusive language, it is reasonable to conclude that the 1999 Amendment was only a clarification and not an expansion of the statute’s proscription.
Yet the majority accepts the reasoning of the district court in rejecting the applicability of American Booksellers II and, indeed, chooses to reverse it. My indepen *249 dent review of this issue does not permit me to join a ruling rejecting the application of binding precedent.
It is readily apparent to me that our decision in American Booksellers II has binding force on the question whether Virginia Code § 18.2-391 is constitutional under the First Amendment. The arguments that were made in that first facial challenge are the same that are now made in this case, and the reasons on which we relied in American Booksellers II to reject those arguments also now apply here.
In American Booksellers I, the challenge to the statute was a facial challenge based on vagueness and on violation of the First Amendment. In our first review, we concluded, as did the district court in this ease, that § 18.2-391 was unconstitutional. When Virginia argued that “retail outlets” selling pornography could “readily modify their display methods to comply” with the statute, we said that the methods suggested were either “insufficient” or “unduly burdensome.” American Booksellers I, 802 F.2d at 696 (emphasis added). We agreed with the plaintiffs’ assertion “that the display provision of the [1985 Version] will unreasonably restrict adult access to materials protected under the first amendment,” id. at 894, stating that the 1985 Version
discourages the exercise of first amendment rights in a real and substantial fashion, and ... it is not readily subject to a narrowing interpretation so as to withstand an overbreadth challenge.
Id. at 696. All of these grounds are parroted in this case by the district court, and now by the majority.
On review of American Booksellers I, however, the Supreme Court observed that if the statute could be construed narrowly, then it might survive the constitutional challenge under the First Amendment. The Court restated the standing constitutional principle applicable to facial challenges that if “ ‘readily susceptible’ to a narrowing construction that would make it constitutional, [a statute] will be upheld.” Virginia v. Am. Booksellers Ass’n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (citations omitted). The Court accordingly certified to the Virginia Supreme Court the question of whether the statute was to be construed narrowly. When the Virginia Supreme Court indicated that the statute should be narrowly construed to save it from invalidity, Commonwealth v. Am. Booksellers Ass’n, Inc., 236 Va. 168, 372 S.E.2d 618, 624-25 (Va.1988), the U.S. Supreme Court vacated our holding in American Book sellers I. On remand, we reconsidered our rulings in American Booksellers I, and in light of Virginia’s authoritative construction of the statute, we upheld it under the First Amendment. American Booksellers II, 882 F.3d at 127-28. We stated that the burden imposed in § 18.2-391 that no person shall “display for commercial purpose in a manner whereby juveniles may examine and peruse” pornographic materials harmful to juveniles “places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state’s police powers.” Id. Even though the argument leading to that language was presented to us from a bookseller’s point of view, the analysis of the provision’s constitutionality and our holding were stated more broadly, and they now clearly apply.
Since this is merely a renewed challenge in which the same First Amendment arguments are made as were made in American Booksellers II, albeit now presented to us by a purveyor using the electronic medium, the holding of American Booksellers II is binding. With respect to the book medium that we considered there, we necessarily held that persons could not openly display books containing material harmful *250 to juveniles in an open air market, even though such a market might be organized to sell books. We held that the implicit requirement imposed by the statute on booksellers- (1) to conceal harmful books from the public at large and (2) to reveal them only to adults did not place an undue burden on the booksellers’ right to sell constitutionally protected material. When our holding is considered in its full breadth, it becomes apparent that it reaches any commercial purveyor of harmful materials. Thus, under American Booksellers II, a seller of harmful materials over the Internet or through any other medium would have to conceal the harmful materials from the public at large and reveal them only to adults. And in light of the technological controls available to such commercial purveyors on the Internet and now being used by them — as demonstrated in Part III, below — the burden is not significantly different from that imposed on booksellers.
I therefore agree with Virginia that the First Amendment issue is “settled” and that this second “First Amendment facial challenge is foreclosed.” But even on the merits under a strict-scrutiny analysis, this facial challenge fails as did the first facial challenge.
Ill
The standard for our review is well known. A content-based restriction on constitutionally protected speech is constitutional under the First Amendment only if it survives strict scrutiny; it “must be narrowly tailored to promote a compelling Government interest.” United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). “If a less restrictive alternative would serve the Government’s purpose, the legislature must use that alternative.” Id.
The district court, as well as the parties, agree that Virginia has a compelling interest in denying juveniles access to pornographic materials that are harmful to juveniles, as described by the statute— materials that depict “sexually explicit nudity, sexual conduct or sadomasochistic abuse” or that contain “explicit and detailed” narratives of “sexual excitement, sexual conduct or sadomasochistic abuse.” Va.Code Ann. § 18.2-391(A)(1), (2). The sole issue on the plaintiffs’ facial challenge based on First Amendment grounds is whether the 1999 Amendment is narrowly tailored to promote Virginia’s interest in denying juveniles access to pornographic materials harmful to them.
Concluding that the statute was unconstitutional, the district court did not identify any less restrictive alternative that would suggest that the statute was not narrowly tailored. Indeed, the court appears to have concluded that the statute was narrowly tailored but, even so, that in balancing the burden imposed by the statute against the benefits gained, the burden “outweighed” the benefits. Such a balancing test, however, does not form part of the strict scrutiny analysis. When it is accepted that the State’s restriction on speech promotes a compelling governmental interest, the test that we must apply is whether the restriction is narrowly tailored to promote the State’s interest. Playboy, 529 U.S. at 813, 120 S.Ct. 1878.
Not only did the district court fail to identify a less restrictive alternative to promote Virginia’s compelling interest, it concluded that the alternatives available were not unduly burdensome. As Virginia had amply demonstrated in the record, the district court recognized that credit card identification systems and PIN numbers, as well as age verification services, are available and effective to restrict a zone of the Internet to adults. Indeed, the district *251 court found that “the costs associated with implementing credit card screening devices and adult PIN systems are unlikely to drive adult Web sites from the ‘marketplace of ideas.’ The fact that thousands of adult Web sites currently utilize verification systems suggests that the burden associated with maintaining such a system is outweighed by the continued consumer demand for the content these Web sites provide.” PSINET, Inc. v. Chapman, 167 F.Supp.2d 878, 888 (W.D.Va.2001). The district court acknowledged that because the Virginia statute is limited to material displayed for a commercial purpose, the concerns expressed in Reno v. ACLU, 521 U.S. 844, 865, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (recognizing that the New York statute held constitutional in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), “applied only to commercial transactions”), were not present in this case. PSINET, 167 F.Supp.2d at 888. The district court thus concluded explicitly that Virginia’s statute — the 1999 Amendment — was not “overly burdensome on commercial Web sites.” Id.
This finding by the district court should have ended the strict-serutiny analysis under the First Amendment, with the conclusion that the statute did not violate the Constitution. But the district court reached an opposite conclusion, relying on a newly fabricated balancing test and on its further observation that the 1999 Amendment
does not include an affirmative defense to prosecution for commercial Web sites if they in fact incorporate such compliance measures. Thus, even the most responsible adult Web sites may have legitimate concerns that they will be subjected to criminal liability in the State of Virginia.
PSINET, 167 F.Supp.2d at 888. The court thus held that the implicit burden created by the threat of criminal prosecution would inappropriately “chill” the plaintiffs’ First Amendment rights. Id.
Even as the district court’s analysis lies outside of the strict scrutiny analysis, the district court also misapprehended the liability imposed by the Virginia statute— noting the absence of an affirmative defense for reasonable compliance efforts— and therefore the court miscalculated the extent of any “chilling” effect. The statute includes the substance of such a defense as part of the State’s proof in establishing a violation. It punishes persons who “knowingly display” materials harmful to juveniles. And the Virginia Supreme Court has authoritatively interpreted this liability narrowly:
A violation must consist of proof beyond a reasonable doubt that the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles.
Commonwealth v. Am. Booksellers Ass’n, Inc., 236 Va. 168, 372 S.E.2d 618, 625 (1988). Thus, to be liable under this statute, the prosecution would have to show that commercial websites (1) knowingly permitted juveniles an opportunity to peruse harmful materials, or (2) took no reasonable steps to prevent such perusal when they were aware of facts putting a reasonable person on notice of the possibility. Id. at 625. This hardly exposes commercial websites to the broad liability feared by the district court.
As Virginia demonstrated in the record, just as booksellers could create zones in their bookstores limited to adult materials and could restrict the perusal and sales of those books to adults, websites can create zones on the Internet limited in access to *252 adults. No adult would, through this process, be denied access to constitutionally-protected speech. See Ginsberg, 390 U.S. at 638 & n. 6, 88 S.Ct. 1274. Rather, minimally burdensome steps would have to be taken to create such adult zones and to limit access to adults. The Supreme Court has recognized the nexus between the availability of Internet filtering technology and the maintenance of adult access to online pornographic materials. See Reno v. ACLU, 521 U.S. 844, 876-77, 881-82, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). In Reno, the Court credited the district court’s finding that “at the time of trial existing technology did not include any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to adults,” id. at 876, 117 S.Ct. 2329, and the Court therefore commended the district court’s refusal “to rely on unproven future technology to save the [Communications Decency Act],” id. at 882, 117 S.Ct. 2329.
But as Justice O’Connor pointed out, “it is possible to construct barriers in cyberspace and use them to screen for identity, making cyberspace more like the physical world and, consequently, more amenable to zoning laws.” Reno, 521 U.S. at 890, 117 S.Ct. 2329 (O’Connor, J., concurring in the judgment in part and dissenting in part). In the context of 1997, however, Justice O’Connor recognized that the necessary technology was available but was too insufficiently dispersed on the Internet to be relied upon for purposes of the Communications Decency Act. As she put it, “Gateway technology is not ubiquitous in cyberspace, and because without it ‘there is no means of age verification,’ cyberspace still remains largely unzoned-and unzoneable.” Id. at 891, 117 S.Ct. 2329. (O’Connor, J., concurring in the judgment in part and dissenting in part) (quoting ACLU v. Reno, 929 F.Supp. 824, 846 (E.D.Pa.1996)).
Yet, only five years later, when the Supreme Court reviewed Congress’ next attempt to regulate Internet obscenity — the Child Online Protection Act (COPA) — it recognized that a publisher of pornographic materials on the Internet could target certain audiences and “need only take the simple step of utilizing a medium that enables it to target the release of its material into those communities.” Ashcroft v. ACLU, 535 U.S. 564, 583, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). Indeed, the Court recognized that COPA did not “foreclose an entire medium of expression” on the Internet because it “only requires that such material be placed behind adult identification screens.” Id. at 583 n. 14, 122 S.Ct. 1700. Thus, within five years’ time, the cyber-barriers that Justice O’Connor had referred to in Reno had become widespread and effective.
And now, the district court in this case has concluded that technological mechanisms exist to create adult zones by using credit cards, passwords, PIN identification, adult verification services, and website self-identification methods. PSINET, 167 F.Supp.2d at 887-88. Moreover, Virginia points out what the district court accepted and what the Supreme Court recognized in Ashcroft v. ACLU:
In the world of web-based commercial pornography, “electronic screens” requiring credit card or age verification devices are commonplace. So, too, are “teasers,” hardcore pornography strategically placed in front of such screens. All commercial pomographers need to do to abide by Virginia law is to move these pre-existing “screens” so that such screens appear before pornographic teasers are displayed.
Accord Ashcroft, 535 U.S. at 583 n. 14, 122 S.Ct. 1700 (citing “adult identification screens” as a feasible Internet alternative).
*253 To reach its conclusion that Virginia’s statute violates the First Amendment, the majority relies on propositions that are unsupported by the record or that are irrelevant to a determination of the scope of the statute. For example, the majority says that “Internet speakers have no way of preventing Virginia juveniles from accessing their Internet speech.” Ante at 235. Yet, as has been pointed out, Virginia demonstrated and the district court accepted the fact that commercial websites distributing pornography are using available technology effectively to create adult zones to regulate access to their material. See PSINET, 167 F.Supp.2d at 888.
The majority also says that § 18.2-391’s “attempt to deny minors access to potentially harmful speech ... will ‘effectively suppress! ] a large amount of speech that adults have a constitutional right to receive and to address to one another.’ ” Ante at 235 (quoting Reno, 521 U.S. at 874, 117 S.Ct. 2329). Yet, there is no evidence in the record that the Virginia statute will operate to suppress any speech among adults. Both Virginia and the district court recognized that adults functioning under the statute will always have access to commercially purveyed pornographic materials. The only question that arose was whether the mechanisms for restricting access to adults was too burdensome. Just as adults who want access to adult magazines and books must enter a bookstore and demonstrate their age to the bookseller, Virginia has demonstrated that adults wanting pornography from commercial purveyors on the Internet must enter an adult zone through use of credit cards, PINs, or other demonstrated technological gateways before gaining access to adult material. Notably, the statute does not reach non-commercial exchanges occurring in e-mail or chat-rooms.
To support its view that the statute overreaches in the scope of its enforcement, the majority essentially discards the Virginia Supreme Court’s holding that the statute is not violated if a website takes “reasonable steps” to assure that juveniles are not perusing harmful material. The majority says,
[TJhere is no indication that the use of a PIN number would be considered a “reasonable step” to prevent “reasonably apparent” perusal by juveniles. As the Plaintiffs have previously pointed out, the Commonwealth would certainly not agree that a liquor or tobacco store that sold to anyone with a valid credit card number, without some additional step to ascertain the age of the customer, was taking reasonable steps to exclude juveniles from the purchase of age prohibitive products.
Ante at 236-37. Yet Virginia demonstrated and the district court accepted the facts that the use of credit cards, PINs, and age verification services are minimally burdensome and that even today, they are used effectively on the Internet.
The fact that thousands of adult Web sites currently utilize adult verification systems suggests that the burden associated with maintaining such a system is outweighed by continued consumer demand for the content that these Web sites provide.... [Moreover] commercial Web sites are less likely than noncommercial sites to be so burdened by the implementation of an adult identification system that they are forced to withdraw their content from the Internet.
PSINET, 167 F.Supp.2d at 888. Realizing that this evidence is in the record and that the district .court made the conclusions that it did, the majority argues further, if not somewhat desperately, that “many adults may be unwilling to provide their *254 credit card number online, and would therefore not visit the site. Such a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card.” Ante at 236-37. But so too are many adults unwilling to enter an adult bookstore and ask for material protected from juveniles. Moreover, we held in American Booksellers II that the Virginia statute imposing these burdens on adults is constitutional against the First Amendment challenge.
Finally, the majority falls back on the notion that if the statute operates as Virginia suggests, the statute would be rendered “powerless.” Ante at 238. This effect, however, is a legislative judgment that must be left to the Virginia legislature. Certainly by creating adult zones for commercial websites that distribute pornography, the legislation reduces the range and quantity of materials accessible to juveniles. It has been often stated that a legislature need not solve the entire problem; it is free to take steps to solve only part of the problem. See, e.g., New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
At bottom, just as the Virginia statute has already been upheld for constitutionality when argued from the point of a bookseller, who was impliedly required to undertake minimally burdensome steps to deny juveniles access to harmful materials while preserving access for adults, a facial review now leads to the same conclusion when argued from the point of view of a seller from an Internet website.
Virginia is justifiably concerned with the open and unrestricted display of pornographic materials harmful to juveniles, and it concededly has a compelling interest in imposing restrictions on display of those materials. The 1985 Version of § 18.2-391, as well as the 1999 Amendment, imposes restrictions on the display of such materials to juveniles for commercial purposes, without denying adults any constitutionally protected speech. See Ginsberg, 390 U.S. at 638 & n. 6, 88 S.Ct. 1274. And this statute, as authoritatively construed by the Virginia Supreme Court, provides a narrowly tailored response directed at commercial purveyors of these harmful materials, directing that they may not knowingly display such materials to juveniles and, if they are aware that such juveniles are perusing such materials, they must take reasonable steps to prevent the perusal. The State has identified the steps that websites can reasonably take, and the district court properly found those steps to be not unduly burdensome.
I would, therefore, uphold Virginia Code § 18.2-391(A) against the First Amendment challenge made in this case.
IV
Finally, Virginia contends that the district court erred in finding that § 18.2-391 violates the dormant Commerce Clause. The district court held that the Virginia statute unduly burdens interstate commerce by placing restrictions on electronic commercial materials in all states. The court stated:
State obscenity regulations are not invalidated under the Commerce Clause because they impose compliance costs on businesses located outside their state’s borders.
Nevertheless, state laws regulating cyberspace pornography currently impose a much greater burden on out-of-state businesses providing adult material on the Internet than state laws regulating real-space pornography.... [T]o avoid prosecution, an adult Web site operator must comply with the most restrictive state obscenity regulations if it is to make its content available on the Web at all. In contrast, purveyors of real-space *255 pornography can choose to comply with the regulations of only those states to which they affirmatively distribute. This leads the court to conclude that ... section 18.2-391 violates the Commerce Clause.
PSINET, 167 F.Supp.2d at 891 (footnote omitted).
For statutes that do not facially discriminate against interstate commerce, the Supreme Court has adopted an analysis for determining whether a State regulation unconstitutionally burdens interstate commerce:
Where the statute regulates even-hand-edly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (citation omit-ted) (quoted in Oregon Waste Sys., Inc. v. Dep’t of Envtl. Quality of Oregon, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).
There is no dispute in this case that Virginia has a “legitimate local public interest” in denying juveniles pornography material deemed harmful to them. Indeed, the parties, as well as the district court, agree that Virginia has a compelling interest in regulating pornography harmful to juveniles. The only question remaining is whether the burden imposed by § 18.2-391 on interstate commerce is “clearly excessive in relation to the putative local benefits.” Pike, 397 U.S. at 142, 90 S.Ct. 844.
The district court’s own conclusions based on the demonstrated technology appear to resolve this question readily. It found that the compliance measures necessitated by § 18.2-391 are not “overly burdensome on commercial Web sites,” PSINET, 167 F.Supp.2d at 888, and “are unlikely to have a substantial effect on commercial Web site operators,” id. at 889. The specific burden on First Amendment rights that the district court determined would overwhelm Virginia’s compelling interest was the denial of adult access to pornography, not § 18.2-391’s putative burden on interstate commerce.
Thus, I agree that Virginia has a compelling State interest in regulating pornography harmful to juveniles within the jurisdictional limits of its sovereignty, and the burden that § 18.2-391 would impose on Internet purveyors would be minimal. I also agree with Virginia’s observation that:
Website operators may still purvey pornography. Adults seeking such material from the Internet may still readily obtain it. All the [Virginia] law requires is that the harmful materials — including free materials — be placed behind the electronic screens already in use, rather than posted as “teasers” in front of it.
Accordingly, I would uphold Virginia’s statute under the facial challenge made pursuant to the dormant Commerce Clause.
V
Virginia has made a staunch attempt to promote its compelling interest in denying juveniles access to harmful pornographic materials while at the same time minimizing the burdens of its regulation on adults. It began in 1970 by tailoring its statute after the Supreme Court’s decision in *256 Ginsberg. And when it amended this statute in 1985, it narrowly tailored the statute to comport with the First Amendment, as we concluded in American Booksellers II. Finally, when it amended the statute in 1999 to clarify its application to the Internet, Virginia made clear that it was restricting the statute to commercial efforts to purvey pornography, and then only to purveyors who knowingly violated the law or who failed to take reasonable steps when aware that the law was being violated. It also provided immunity to Internet Service Providers. See 2000 Va. Acts ch. 1009 (now codified in Va.Code Ann. § 18.2-391(A)(2)).
If this narrowly tailored statute does not survive strict scrutiny, then the conclusion must be drawn that States have no alternative but to abandon efforts to regulate Internet-based pornography deemed harmful to juveniles. Yet, the Supreme Court is not prepared to accept this conclusion, nor is Virginia. To the contrary, the Supreme Court has observed that with the appropriate technology, zones of adult material can be created on the Internet as an appropriate form of regulation. See, e.g., Ashcroft, 535 U.S. at 583 & n. 14, 122 S.Ct. 1700; Reno v. ACLU, 521 U.S. at 886-91, 117 S.Ct. 2329 (O’Connor, J„ concurring in the judgment in part and dissenting in part).
Commercial websites distributing pornography on the Internet now make use of technology that can be applied to comport with Virginia’s statutory requirements. They display free clips of their material as “teasers” to entice the viewer to enter their adult zone and purchase a complete viewing of this material. To enter the zone, however, the viewer must provide credit and adult verification. Moreover, as Virginia demonstrated and the district court accepted, the fact that age verification measures are now available and are being used with minimal burden on e-commerce, it is difficult to conceive how these web-site purveyors should complain when Virginia suggests that these mechanisms could be employed to satisfy § 18.2-391. Conceptually, pornographic websites today operate adult “e-bookstores” into which they invite all adults, and they are controlling access to their adult zones of cyberspace. This is hardly different from the “real-space” circumstances of a bookseller selling pornography.
I would reverse the judgment of the district court and uphold the constitutionality of the statute. I therefore respectfully dissent.

 Quoting Virginia Code § 18.2-390(6): “Harmful to juveniles " means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (a) predominantly appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.